UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
Johnnie L. Petway,

        Plaintiff,

    v.

City of New York, New York City Police
Department, New York City Fire Department,
Emergency Medical Services Command of the
New York City Fire Department, Police Officer
Robert Grau, Police Officer Ernest Barone
(Shield #25445), Sergeant Anthony Motolla
(Shield #03687), EMS Lt. Joanne Miller,
James McDermott, Richard Hickey, New York
City Fire Department Fireman John Doe #1,
New York City Fire Department Fireman John
Doe #2,

        Defendants.
-----------------------------------------------------------X
GARAUFIS, United States District Judge.

<u>MEMORANDUM & ORDER</u>
02-CV-2715 (NGG) (LB)


**NOT FOR PUBLICATION**


      In this action, Johnnie Petway (the "Plaintiff") brings suit against the defendants

(collectively, "Defendants") pursuant to 42 U.S.C. § 1983 and various state tort laws.

Specifically, the Plaintiff seeks relief for violations of his Fourth and Fourteenth Amendment

rights and for state-law tort causes of action which include assault, battery, and false

imprisonment.  At this time, the court considers the Defendants' motion for summary judgment,

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth below, the

motion is granted in part and denied in part.

**I.**     **Background**

      On January 30, 2001, the Plaintiff was in his living quarters at 556 Gates Avenue in

Brooklyn, New York. (Am. Compl. at 2.) He smelled smoke, went to investigate, and saw a small fire in his hallway. (Id.) After seeing the fire, the Plaintiff went downstairs to find a fire extinguisher. (Id.) As he descended the stairway, the lights went off. (Id.) The Plaintiff's pets were still upstairs, and fearing for their safety, he rushed back towards his apartment. (Id.) As he was going up the stairs, the Plaintiff slipped, fell, and sustained burns on his right hand, his fingers, his thumb, his left ear, and the left side of his face. (Id.) When he returned upstairs, he saw that the fire had begun to rage out of control. (Id.) The Plaintiff then opened the door to his residence, and two of his dogs escaped with him down the stairs. (Id. at 3.) Three of his dogs, however, remained inside as the Plaintiff determined that the fire was too intense for him to attempt to rescue them. (Id.)

Once outside, he yelled for someone to call 911. (Id.) The New York City Fire Department ("FDNY") soon arrived. (Id.) Immediately upon their arrival, the Plaintiff approached Battalion Chief Richard Hickey. (Id.) He explained to Hickey that his dogs were upstairs and Hickey assured the Plaintiff that they would rescue the dogs. (Id.) The Plaintiff, however, observed that no efforts were being made to rescue the dogs or to put out the fire. (Petway Dep. at 63.) As a result, the Plaintiff again approached Hickey and asked him why no one was trying to rescue his pets or put water on the fire. (Id.) Hickey told him to "get out of here." (Id., Am. Compl. at 3.) Believing his question to be reasonable, the Plaintiff asked Hickey again when he would rescue the pets. (Id. at 63-64.) Hickey told him, "Get the hell out of here." (Id., Am. Compl. at 3-4.) Soon afterwards, two or three firemen grabbed the Plaintiff, shoved him, and told him "to get the fuck out of here." (Am. Compl. at 3-4.) The Plaintiff identified one of these firemen as Lieutenant James McDermott. (Petway Dep. at 66.)

A shoving match ensued between the firemen and the Plaintiff and the Plaintiff refused to be pushed back away from his home any further.  (Id. at 70-71.)  At that point, according to the Plaintiff, Lt. McDermott took off his helmet, and struck the Plaintiff in the head with it.  (Id. at 71, 72-74, 76.)  Police Officer Ernest Barone then handcuffed the Plaintiff's wrists behind his back.  (Id. at 77, 80.)  The Plaintiff alleges that Lt. McDermott punched him once again while he was handcuffed, specifically that McDermott struck him in the face with such force that he broke the Plaintiff's nose.  (Id. at 77, 80-81, 83.)  Shortly afterwards, the handcuffs were removed.  (Id. at 80.)

Two police officers then escorted the Plaintiff across the street.  (Id. at 86.)  The Plaintiff was told there that he would be brought to the hospital.  (Id. at 86.)  The Plaintiff responded that he "wasn't looking to go to the hospital."  (Id. at 86-87.)  The Plaintiff was then informed by EMS Officers, Lieutenant Joanne Miller and Sergeant Anthony Motolla that he had no choice in the matter and that he would be brought to the hospital against his will if necessary.  (Id. at 87.)  The Plaintiff was told that he could go to the hospital "voluntarily and willingly" or that he would be brought to jail and transported to the hospital from there.  (Id.)  The Plaintiff continued to protest.  (Id.)  Lt. Miller explained that they could bring him to the hospital even against his wishes if they determined that his condition was a matter of life and death.  (Id. at 87.)  Sgt. Motolla told the Plaintiff that if he did not cooperate, they would "threaten to tranquilize" him. (Id.)  The Plaintiff expressed concerns about physical ailments he suffered and medication he took, and the possibility of an allergic reaction to tranquilization.  (Id.)  Ultimately, facing the threat of tranquilization, the Plaintiff agreed and went to the hospital.  (Id.)  He was brought initially to the emergency room.  (Id. at 94.)  Afterwards, he was brought to the burn unit, where

he remained for over two weeks.  (Id. at 95.)

Proceeding pro se and in forma pauperis, the Plaintiff filed his initial complaint on April 29, 2002.  (April 29, 2002 Compl.)  On February 14, 2003, he filed an amended complaint.  (Feb. 14, 2003 Am. Compl.)  In August of that year, the Plaintiff retained Charles Ryans as his attorney.  (Aug. 12, 2003 Notice of Appearance by Charles H. Ryans, Jr.)  Discovery was completed on November 8, 2004.  (Oct. 18, 2004 Order.)  On March 4, 2005, the Defendants moved for summary judgment.  (March 4, 2005 Notice of Motion for Summary Judgment.)

## II.    Discussion

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In deciding a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and all reasonable inferences and ambiguities must be resolved against the non-moving party.  Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2nd Cir. 2001).  Where there are no such genuine issues of fact, and all facts, inferences, and ambiguities are construed in favor of the non-moving party, summary judgment for the moving party is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Mack v. Otis Elevator Co., 326 F.3d 116, 119-20 (2d Cir. 2003) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### A.    Claims Against NYPD, FDNY, and EMS

The Defendants contend, and indeed the Plaintiff does not dispute, that the Plaintiff's claims against the New York City Fire Department ("FDNY"), the New York City Police Department ("NYPD"), and the Emergency Medical Services Command of the New York Fire Department ("EMS") should be dismissed on summary judgment because these three entities are not suable. See Parker v. DeBuono, 98 Civ. 5765, 1999 WL 771365 (S.D.N.Y. Sep. 28, 1999), at *2 (NYPD, EMS, and FDNY are not suable entities); McAllister v. New York City Police Dep't, 97 Civ. 7420, 1998 WL 314732, at *1 (S.D.N.Y. June 15, 1998) (NYPD is not a suable entity). "Pursuant to Rule 17(b) of the Federal Rules of Civil Procedure, the capacity [of a government agency] to sue or be sued must be determined by the law of the State in which the district court is held. The State of New York has neither expressly given nor necessarily implied that the NYPD, FDNY or EMS can sue or be sued in their individual capacities." Parker, 1999 WL 771365, at *2 (citations and quotations omitted).[1] Plaintiff's claims against the FDNY, NYPD and EMS are therefore dismissed.

B.    *Verbal Harassment and 42 U.S.C. § 1983*

The Defendants argue that to the extent the Plaintiff bases his § 1983 claim on verbal harassment by the defendants, it ought to be dismissed because verbal abuse does not amount to a violation of a federally protected right. (Defs. Mem. at 17.) "Generally, mere verbal abuse, and even vile language, does not give rise to a cognizable claim under 42 U.S.C. § 1983." Beal v. City of New York, 92 Civ. 0718, 1994 WL 163954, at *6 (S.D.N.Y. April 22, 1994); see also

---

[1]It should be noted that the EMS merged with the FDNY in 1996. New York City Fire Department, History and Heritage / EMS, at http://nyc.gov/html/fdny/html/history/ems.shtml; see also Giuliani's Budget Plan: the Overview, N.Y. TIMES, May 10, 1996, at A1. As part of the FDNY, which is not a suable entity, the EMS remains not suable.

Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Verbal threats do not typically amount to a violation of § 1983 unless they rise to the level of a 'brutal and wanton act of cruelty.' Beal, 1994 WL 163954, at *6. In rare cases where a defendant has been held liable under § 1983 for verbal threats, the cases have involved "threats that were grossly disproportionate to the need for action under the circumstances, and that were inspired by malice rather than merely careless or unwise excess of zeal so that [they] amounted to an abuse of official power that shocks the conscience." Id. (citations and quotations omitted).

In the present case, the Plaintiff alleges that FDNY personnel told him to get out of the way, to "get the hell out of here," and to "get the fuck out of here." (Petway Dep. at 63-65, Am. Compl. at 3-4.) In addition, the Plaintiff claims that Sgt. Motolla threatened to tranquilize the Plaintiff when he refused to go to the hospital. (Petway Dep. at 88.) Given that at the time a fire was raging and Plaintiff was bloodied and suffering from severe burns over his face, ear, hand, and fingers, see Pl. Am. Compl. at 2; Petway Dep. at 85, 88, 95; Miller Dep. at 25, the statements made here by government officials cannot reasonably be considered "brutal or wonton" cruelty. Nor do these statements "shock the conscience" in light of the circumstances and Plaintiff's medical condition. Moreover, the Plaintiff himself states that he has made no claim of verbal harassment. (Pl. Opp. at 20.) Claims of verbal harassment under § 1983 are therefore dismissed.[2]

_____

[2] It should also be noted that the Defendants, in their motion papers, argue that their failure to save the Plaintiff's dogs did not violate the Plaintiff's constitutional rights. (Defs. Mem. 6.) However, the Plaintiff's complaint never alleged that such failure amounted to a constitutional violation, and indeed the Plaintiff himself explained that this was not material to his constitutional claims against the Defendants. (Pl. Opp. at 2.) As these claims were never

*C.  Officer Grau*

The Defendants contend, in addition, that claims against Officer Grau ought to be dismissed because the Plaintiff has conceded that Officer Grau did nothing to him. (Defs. Mem. at 5.) The Plaintiff made no response to this contention. At his deposition, the Plaintiff acknowledged that there was "nothing between [him] and Mr. Grau" and that Officer Grau had done "absolutely nothing" to him as far as he knew. (Petway Dep. at 112-13.) A plaintiff must at least allege that he suffered an injury by a defendant for his claim against that defendant to survive summary judgment. Wachtler v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (a concrete and particularized injury that is traceable to challenged action of the defendant is required for a plaintiff to have standing to bring a claim). Here, since the Plaintiff does not allege that Officer Grau caused him any injury, the Plaintiff's claims against Officer Grau are dismissed.

*D.  Unidentified Officers*

*i.  Rule 4(m) of the Federal Rules of Civil Procedure*

The Defendants argue that the claims of excessive force against two unnamed officials should be dismissed because the Plaintiff has failed to identify these parties in the nearly three years that have passed since the start of this litigation. (Defs. Mem. at 8.) In response, the Plaintiff argues that the unknown identities of these two officials merely raises an issue of fact that should be left for the jury to decide. (Pl. Opp. at 5.) In addition, the Plaintiff requests that the court order the Defendants to produce documents that the Plaintiff has previously sought so that he might better be able to identify the unnamed individuals. (Id. at 5-6.) The Defendants

raised, they are not considered among the claims maintained by the Plaintiff.

further argue that even if the claims are not dismissed for lack of identification, they should nonetheless be dismissed because the officers' actions were reasonable under the circumstances. (Id.) Because the court determines that the claims should be dismissed due to untimely service, it need not address the issue of the reasonableness of the officials' acts.

As a general rule, federal courts disfavor the use of unidentified "John Doe" defendants, but recognize that in certain situations a plaintiff may not be in a position to know the actual identity of a defendant and therefore should be permitted to proceed against an unidentified party. Covington v. Warden of C-95, 93 CV 1958, 1996 WL 75211, at *4 (E.D.N.Y. Feb. 8, 1996). Nonetheless, a plaintiff's obligation to serve a defendant in a timely fashion is not waived merely because a plaintiff has filed a complaint against an unnamed party. Cammick v. City of New York, No. 96 Civ. 4374, 1998 WL 796452, at *1 (S.D.N.Y. Nov. 17, 1998). The Federal Rules of Civil Procedure direct that a party serve a defendant within 120 days of filing the complaint. Fed. R. Civ. P. 4(m). In the event that a plaintiff fails to serve process upon a defendant within that time period, the court "shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." Id.

Here, the Plaintiff originally filed his complaint on April 29, 2002. (See Apr. 29, 2002 Compl.) In the more than three years that have passed since then, he has not identified the John Doe defendants and has therefore not served process upon them. This failure is not the result of lack of opportunity. Magistrate Judge Bloom extended the discovery deadline on several occasions to accommodate requests made by the Plaintiff. (See April 9, 2004 Order; Aug. 3,

2004 Order; Sept. 29, 2004 Order; October 18, 2004 Order.)  The Plaintiff has had over three

years, far more than the typical 120 day time period, to identify and serve the John Doe

defendants, and the court is under no obligation to extend the deadline indefinitely.  See Thomas

v. Keane, No. 99 Civ. 4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing

claim under Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within

roughly two years of filing complaint); Cammick, 1998 WL 796452, at *1 (dismissing a claim

under Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and

five months of filing complaint); Waldo v. Goord, No. 97-CV-1385, 1998 WL 713809, at *5

(N.D.N.Y. Oct. 1, 1998) (dismissing a claim under 4(m) where the pro se plaintiff failed to serve

John Doe defendants within a year of filing his complaint).  The court therefore dismisses

without prejudice the claims against the unidentified defendants for lack of timely service.

> ii. *Plaintiff's Motion to Compel*

In an effort to discover the identities of the John Doe defendants, the Plaintiff urges the

court to compel the Defendants to respond to three previously made document requests.  (Pl.

Opp. at 6.)  The court denies this motion.  The Plaintiff's first document request was made

orally, and the Defendants requested that it be put in writing.  (McDermott Dep. at 13-14.)  The

Plaintiff did not object to the Defendants' request, nor has the Plaintiff provided evidence that he

put this request in writing.  (Defs. Reply at 5.)  The Plaintiff's second document request was

answered by the Defendants.  (Defs. Sept. 13, 2004 letter.)  With respect to the third document

request, Magistrate Judge Bloom ordered that it need not be answered due to the request's

untimeliness.  (Magistrate Judge Bloom Oct. 18, 2004 Order.)

Although the Plaintiff has been given previous extensions and has been provided with

ample opportunity to identify the John Doe defendants, he again seeks to extend the deadline for discovery. The court declines to do so. See Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (denying further discovery when the party opposing summary judgment had a "fully adequate opportunity for discovery"); see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 927 (2d Cir. 1985) (denying plaintiff's request to reopen discovery when plaintiff had "ample time in which to pursue the discovery that it now claims is essential"). Here, the Plaintiff himself failed to make one request in writing, made one untimely request, and has already received an answer to a third request. He has been given adequate time to conduct discovery and is not entitled to further extensions. Consequently, the court refuses to compel discovery of these documents.

E.     Adequacy of Service Upon Lieutenant Miller

The Defendants also contend that claims against Lt. Miller should be dismissed on the grounds of failure to serve process. (Defs. March 4, 2005 Statement at 2.) The Plaintiff responds that due to the fact that the Plaintiff began this proceeding pro se and in forma pauperis, service upon Lt. Miller's should effectively be excused. (Pl. Resp. at 1.)

As explained above, a cause of action is subject to dismissal if a plaintiff has failed to serve a defendant with a summons and complaint within 120 days after filing the complaint. Fed. R. Civ. P. 4(m). While pro se litigants should be afforded a degree of latitude, they are nevertheless generally required "to inform themselves regarding procedural rules and to comply with them." LoSacco v. City of Middleton, 71 F.3d 88, 92 (2d Cir. 1995). Where a pro se plaintiff is confused about requirements detailed in Rule 4, the court may extend the 120-day deadline. Herrera v. New York Tel. Co., 93 Civ. 2599, 1995 WL 405842, at * 1 (S.D.N.Y. July

10, 1995).   Nevertheless, courts may dismiss cases for failure of service after an appropriate

amount of time. See Thomas, 2001 WL 410095, at *1, *5 (dismissing pro se claim about two

years after filing complaint); Waldo, 1998 WL 713809, at *5 (dismissing pro se claim within a

year of filing complaint).

Here, three years have passed since the Plaintiff filed his initial complaint.  The failure to

serve is not due to confusion concerning the service of process rule.  Indeed, the Plaintiff

properly served other defendants, and provided proof of such service to the court.  (See, e.g.,

Aug. 8, 2002 Summons; March 25, 2003 Summons.)  Furthermore, although the Plaintiff

initially brought his case pro se, he has had the guidance of retained counsel for almost two

years.  (See Aug. 12, 2003 Notice of Appearance.)  In that almost two-year period, however,

there has been no showing that Lt. Miller was ever properly served.  Cf. Herrera, 1995 WL

405842, at *1 (refusing to dismiss case despite untimely service because the litigant began the

case pro se but later retained counsel who promptly remedied the failure of service).  Dismissal

of claims against Lt. Miller for lack of service is therefore appropriate.[3]

F.      42 U.S.C. § 1983 Claims Against the City of New York

The Defendants further maintain that the Plaintiff's §1983  claims against the City of

New York should be dismissed because the Plaintiff has failed to demonstrate that a municipal

---

[3] It should be noted that the Plaintiff incorrectly argues that the Defendant bears the
burden of proving Lt. Miller was never served.  (Pl. Resp. at 1.)   Because the Defendant has
validly challenged the service of process, the burden shifts to the Plaintiff to prove that proper
service was performed.  Johnson v. Quik Park Columbia Garage Corp., No. 93 Civ. 5276, 1995
WL 258153 at *1 n.2 (S.D.N.Y. May 2, 1995).

policy was the cause of the alleged violations.[4]  (Defs. Mem. at 18.)  Title fourty-two U.S.C.

§1983 provides a cause of action against any person who, under color of state law, violates rights

or privileges established under the Constitution or law of the United States.  Local governments

are considered a "person" for §1983 purposes and can therefore be sued under the statute.

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978).  However, a local government is

not liable under §1983 for injury which is merely the result of a government employee's

conduct, but rather only when the injury at issue is the result of an adopted  municipal policy or

custom.  Monell, 436 U.S. at 690; see also Coon v. Town of Springfield, 404 F.3d 683, 686 (2d

Cir. 2005).

>        i.      *Failure to Train*

In his amended complaint, the Plaintiff alleges that New York City should be held liable

for its failure to train its "uniformed members" properly.  (Am. Compl. at 6.)  The Supreme

Court has held that a municipality may be held liable for failure to train its employees where it

acts with "'deliberate indifference' to the rights of persons with whom the police come into

contact."  City of Canton, 489 U.S. 378, 388 (1989). The Second Circuit elaborates:

> City of Canton requires that plaintiffs establish not only that the
> officials' purported failure to train occurred under circumstances
> that could constitute deliberate indifference, but also that plaintiffs
> identify a specific deficiency in the city's training program and
> establish that that deficiency is "closely related to the ultimate
> injury," such that it "actually caused" the constitutional
> deprivation.  Thus, the Supreme Court emphasized in City of
> Canton that plaintiffs must establish that "the officer's

---

[4]  The Plaintiff does not directly address this argument in his opposition brief, but does
contend that his §1983 claims should not be dismissed even in the event that city officers may
have qualified immunity.  (Pl. Opp. at 21-22.)  Additionally, he argues that the action should not
be dropped because there are disputed facts which a jury ought to resolve at trial.  (Id. at 22.)

> shortcomings . . . resulted from . . . a faulty training program"
> rather than from the negligent administration of a sound program
> or other unrelated circumstances.

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d. Cir. 2004) (citing Canton, 489

U.S. at 390-91).  Here, even when specifically called upon to support his § 1983 claim against

the city, the Plaintiff has provided no evidence of a specific deficiency in New York City's

training program or the deficiency's close relationship to his injury.  The court therefore

dismisses the Plaintiff's § 1983 claim concerning the City's alleged failure to properly train its

employees.

*ii.*      *Failure to Supervise*

In his amended complaint, the Plaintiff also argues that New York City failed to properly

supervise its "uniformed members."  (Pl. Am. Compl. at 6.)  To survive summary judgment, a

claim for failure to supervise must also be supported by evidence of a municipal policy or

custom which caused the injury.  Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).

In a failure to supervise case, a plaintiff must typically establish that "a policymaking official

had notice of a potentially serious problem of unconstitutional conduct, such that the need for

corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or

rectify the situation evidences deliberate indifference, rather than mere negligence or

bureaucratic inaction."  Amnesty America, 361 F.3d at 128 (citations and quotations omitted).

Here, the Plaintiff has provided no evidence that a policymaking official had notice of a

potentially serious problem of constitutional conduct, that the need for corrective supervision

was obvious, or that any inaction was due to deliberate indifference.  In short, the Plaintiff has

provided no evidence to prove a required element for a valid § 1983 claim against the City of

13

New York. Consequently, the court must dismiss the Plaintiff's claim alleging New York City's failure to supervise.

### G. Claims Against Lt. McDermott

#### i. Identification of Lieutenant McDermott

The Defendants assert that the Plaintiff's claims against Lt. McDermott must be dismissed because there is doubt as to whether the Plaintiff has properly identified him. (Defs. Mem. at 10.) Specifically, they argue that there are inconsistencies in the record which suggest that the Plaintiff may have misidentified Lt. McDermott as the person who allegedly struck the Plaintiff with his fist and with his helmet. (Id.) The Plaintiff, however, contends that he sufficiently identified Lt. McDermott, and that the claim against him should therefore not be dismissed on summary judgment. (Pl. Opp. at 2-4.)

For summary judgment purposes, the court resolves all ambiguities and draws all inferences in favor of the non-moving party. Schwabenbauer v. Board of Education, 667 F.2d 305, 313 (2d Cir. 1981). Here, the Plaintiff alleges that he was struck twice. (Petway Dep. at 71, 82-83.) He believed that his assailant was "approximately" five feet ten inches tall and that he was no taller than six feet. (Id. at 66.) A witness, who testified that a fireman struck the Plaintiff, did not remember distinctly how tall the person was who struck the Plaintiff, but indicated that he was about six feet ten inches tall while wearing a helmet. (Lyons Dep. at 34-36.) Lt. McDermott is five feet seven and a half inches tall. (McDermott Aff. at 1.) Thus, because the Plaintiff and a witness believe the alleged tortfeasor to be taller than Lt. McDermott actually is, the Defendants urge the court to dismiss the case against Lt. McDermott. The court declines to do so.

The court must draw all inferences in the Plaintiff's favor, and it is reasonable to infer that the Plaintiff and witness could have misjudged Lt. McDermott's height. First, the Plaintiff believed his tortfeasor to be only two and a half inches taller than Lt. McDermott actually is, a relatively minimal and easily mistakable difference. Second, the alleged tortfeasor was wearing his helmet and, presumably, his boots, and these articles of clothing would have made him appear taller than he was. Third, the Plaintiff and witness were not in a situation where they had the opportunity to carefully observe the alleged's tortfeasor's exact measurements. Thus, viewing the facts in the light most favorable to the Plaintiff, the court denies the Defendants' motion to dismiss the cause of action against Lt. McDermott on account of the inaccurate assessments of Lt. McDermott's height.

### ii. Excessive Force

As an alternative argument, the Defendants urge that even if the Plaintiff sufficiently identified Lt. McDermott, the Lieutenant's acts were reasonable in light of the circumstances and therefore did not violate Plaintiff's constitutional rights.[5] (Defs. Mem. at 11.) The Plaintiff counters that Lt. McDermott did not act reasonably, and asserts additionally that the

---

[5] They also argue that the broken nose may not have been caused by Lt. McDermott. Specifically, they conjecture that the Plaintiff may have broken his nose when he fell on the stairs of his building. (Defs. Mem. at 11.) They note, in addition, that the Plaintiff was not treated for a broken nose while at the hospital. (Defs. Mem. at 11-12.) The Plaintiff testified, however, that Lt. McDermott struck his nose so hard that the Plaintiff's nose began to bleed, causing blood to pour "all over" his pants and shirt. (Petway Dep. at 85.) In addition, a hospital report two days after the event indicated that the Plaintiff had "bilateral comminuted nasal bone fractures." (See Feb. 1, 2001 New York Presbyterian Hospital Diagnosis at 1.) In light of this testimony and information, the court cannot find that there is no disputed issue of fact as to whether the Plaintiff's nose was broken. In any event, even if the Plaintiff's nose was not broken, Lt. McDermott's alleged striking of the Plaintiff, while the Plaintiff was handcuffed, restrained, and unthreatening, would nevertheless constitute an unreasonable and excessive use of force.

reasonableness of McDermott's acts should in any event be resolved by a trier of fact. (Pl. Opp. 8-12).

The Fourth Amendment protects against "unreasonable" seizures. See Graham v. Connor, 490 U.S. 386, 395 (1989). "The 'reasonableness' of a particular seizure depends not only on *when* it was made, but also on *how* it is carried out." Id. (emphasis in original). Thus a plaintiff can "prevail on his excessive force claim if he is able to show that [a government officer] used more force than was necessary to subdue him."[6] Curry v. City of Syracuse, 316 F.3d 324, 332 (2d Cir. 2003). Determining whether a particular seizure was reasonable is a fact-intensive process, requiring careful consideration of the facts and circumstances of the particular case, including the severity of the crime and the dangerousness of the suspect. Graham, 490 U.S. at 395. The officer's actions also must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 395; see also Saucier v. Katz, 533 U.S. 194, 205 (2001) (citing Graham). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 397. In an excessive force case, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at

---

[6] Although the Fourth Amendment was primarily directed at restraining unreasonable searches and seizures conducted by the police, the Amendment also imposes restraints upon civil authorities, including firefighters. New Jersey v. T.L.O., 469 U.S. 325, 335 (1985) ("[T]he [Supreme] Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'– that is, 'upon the activities of sovereign authority.' Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities....") (citations omitted); see also Michigan v. Clifford, 464 U.S. 287, 293 (1984) (applying Fourth Amendment restraints to firefighters).

397; <u>see also</u> <u>Saucier</u>, 533 U.S. at 204-5 (citing <u>Graham</u>).

The facts of this case, viewed in the light most favorable to the non-moving party, unfold as follows. The Plaintiff escaped from a burning building, and emerged injured and very concerned about his three dogs that remained trapped inside. (Am. Compl. at 2-3.) Firefighters eventually arrived, and the Plaintiff approached Chief Hickey to ask about efforts being made to save his dogs. (<u>Id.</u> at 7) Although the Plaintiff was assured his dogs would be rescued, he asked Chief Hickey a second time after no efforts were made to do so. (Am. Compl. at 3; Petway Dep. at 63-64.) Chief Hickey then verbally reprimanded the Plaintiff to move away and two firemen began shoving him. (<u>Id.</u> at 64-65.) As the Plaintiff protested being shoved, he was again verbally reprimanded, at which point Lt. McDermott took off his helmet and struck the Plaintiff in the head with it. (<u>Id.</u> at 72-74.) The Plaintiff's hands were still at his side when he was struck. (<u>Id.</u> at 74.) Officer Barone then handcuffed the Plaintiff's wrists tightly behind his back. (<u>Id.</u> at 80.) While handcuffed, Lt. McDermott struck the Plaintiff again, this time in the face and with such force that it may have broken his nose. (<u>Id.</u> at 83.)

When one considers this scenario from an on-the-scene perspective, Lt. McDermott's use of force was clearly excessive. Lt. McDermott allegedly struck the Plaintiff in his head with a helmet even though the Plaintiff's arms were at his sides and seemingly posed no physical threat. Plaintiff's wrists were then securely handcuffed behind his back. Thus restrained, the Plaintiff appeared to be of no danger to himself or to others. Nor is there any indication that the Plaintiff was trying to escape. Nevertheless, while the Plaintiff was restrained and in this vulnerable position, Lt. McDermott allegedly punched him in the face so forcefully that it broke the Plaintiff's nose. Viewed in this light, the facts indicate the use of unreasonable force in violation

of the Plaintiff's Fourth Amendment rights, and thus Plaintiff's excessive force claim will not be dismissed on summary judgment.

### iii. *Qualified Immunity*

The Defendants argue, in addition, that Lt. McDermott should be entitled to qualified immunity since he reasonably believed his actions to be lawful. (Defs. Memo. at 12-13.) They maintain that a reasonable officer "could have believed that exerting some force to remove the plaintiff from the scene was an appropriate response in these circumstances." (Defs. Mem. at 13.) Where a defendant claims qualified immunity, and moves for summary judgment on this ground, the court engages in a two step analysis. <u>Saucier</u>, 533 U.S. at 201. The initial inquiry is whether, viewed in the light most favorable to the injured party, the facts alleged demonstrate that the officer's conduct violated a constitutional right. <u>Id.</u> If there has been no constitutional violation made out on the alleged facts, the inquiry ends. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." <u>Id.</u> If a right has not been clearly established, then an official, acting unconstitutionally, is not on notice that his conduct is unlawful. <u>Id.</u> at 202. In the absence of such notice, summary judgment based on qualified immunity is appropriate. <u>Id.</u>

As described above, the facts alleged indicate that Lt. McDermott used excessive force and thus violated the Fourth Amendment. The court, therefore, proceeds to the second step of the <u>Saucier</u> analysis and asks whether this violated right was clearly established. There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident. <u>See, e.g.</u>, <u>Graham</u>, 490 U.S. at 395 (explaining the standard to be used to determine whether a government official used excessive force). Striking the Plaintiff while he

was handcuffed, restrained, and unthreatening was unlawful conduct given the circumstances, and that it was excessive "would [have been] clear to a reasonable officer." Saucier, 533 U.S. at 202. Consequently, Lt. McDermott does not have qualified immunity with regard to his alleged striking of the Plaintiff.

### iv. *Participation of Other Officials*

The Defendants urge the court, in addition, to dismiss on summary judgment any claims against Chief Hickey, Officer Barone, and Sgt. Motolla with regard to this alleged striking. Specifically, the Defendants argue that the Plaintiff fails to allege any participation of these three officials, and that it would therefore be appropriate to dismiss claims against them.

A plaintiff must, at minimum, allege that he suffered an injury by a defendant for his claim against that defendant to survive summary judgment. Wachtler v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Here, the Plaintiff has not alleged that Chief Hickey, Officer Barone, or Sgt. Motolla participated in Lt. McDermott's alleged use of excessive force. Therefore, the claims against Chief Hickey, Officer Barone, and Sgt. Motolla are dismissed.

### H. *False Arrest Claims*

The Defendants argue that the court should dismiss the Plaintiff's false arrest claims on the grounds that the Plaintiff was never formally arrested.[7] (Defs. Memo. at 15.) The Plaintiff, however, argues that a person need not be actually arrested to state a valid claim of false arrest.

---

[7] It is unclear whether the Defendants seek a dismissal of false arrest claims brought under state tort law or of false arrest claims brought under §1983 for a violation of the Plaintiff's Fourth Amendment rights. In any event, dismissal is justified in neither situation.

(Pl. Opp. at 18.) Specifically, he argues that he was placed in a position where a reasonable person would not have felt free to leave and that this deprivation of freedom was sufficient to state a false arrest claim. (Id.)

A cause of action for false arrest can be brought either as a violation of state tort law or as a violation of § 1983 based on an unreasonable seizure under the Fourth Amendment. See, e.g., Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003). For neither cause of action is formal arrest a necessity. For the state law tort claim,[8] a plaintiff must show that the defendant intended to confine the plaintiff, the plaintiff was conscious of the confinement, the plaintiff did not consent to the confinement, and the confinement was not otherwise privileged. Id. Significantly, "[t]here is no requirement under New York law that an arrest be in any sense formal." Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991); see also Hicks, 508 N.Y.S.2d at 166 (1986) ("Even without a technical formal arrest, a suspect's detention may in fact be the equivalent of an arrest...."); People v. Chestnut, 431 N.Y.S.2d 485, 489 (1980) ("[W]hen the intrusion involved is of sufficient magnitude, an 'arrest' will be said to occur whether or not the person is eventually transported to the police station and charged with a crime."). To determine whether a person has been arrested, the court considers whether a reasonable man, innocent of any crime, would have thought he was arrested. People v. Hicks, 508 N.Y.S.2d at 166 (citing People v Yukl, 25 N.Y.2d 585, 589 (1969)).

---

[8] Under the doctrine of supplemental jurisdiction, a federal district court can hear a state tort law false arrest claim. See e.g., Rodriguez v. Phillips, 66 F.3d 470, 482 (2d Cir. 1995). The court may preside over a pendent state-law claim which shares the same set of facts as a claim over which the court has original jurisdiction. Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 704-05 (2d Cir. 2000) (explaining that state-law false arrest claim must share with the federal-law claim "a common nucleus of operative fact" for the court to hear the state-law claim by means of supplemental jurisdiction)

Similarly, a plaintiff need not show that there was a formal arrest to state a valid § 1983 claim. Arrest is the "quintessential seizure of the person." Posr, 944 F.2d at 97 (citing California v. Hodari D., 499 U.S. 544, 551-57 (1980)). However, a person need not be formally arrested to be seized in violation of the Fourth Amendment. Id. at 97. Under constitutional standards, a person is seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 99 (finding that even without a formal arrest, a plaintiff was sufficiently "arrested" and "seized" for false arrest and § 1983 purposes when an officer "slammed" the plaintiff against a wall); Green v. City of New York, No. 01 Civ. 1996, 2004 U.S. Dist. LEXIS 5, at *32-33 (S.D.N.Y. Jan. 5, 2004) ("There is no doubt that Mr. Green's transport to the hospital against his wishes was a 'seizure' within the meaning of the Fourth Amendment.").

In this case, although the Plaintiff was never formally arrested, his wrists were tightly handcuffed behind his back and he was struck in the head and face. (Petway Dep. at 79-80, 83, 112.) Furthermore, the Plaintiff was informed that he would be transported to the hospital against his will, perhaps even tranquilized. (Id.) Defendants point out that the Plaintiff was only handcuffed for several minutes, but a seizure may be effected for the purposes of the Fourth Amendment even when an officer "briefly detains an individual and restrains that person's right to walk away." United States v. Moreno, 897 F.2d 26, 30 (2d Cir. 1990). A reasonable person, in the Plaintiff's situation, could reasonably have believed that he was not free to leave. Thus, the Plaintiff's false arrest claims will not be dismissed merely because the Plaintiff was not formally arrested.

I.    *Right to Refuse Medical Treatment*

The Plaintiff has argued that he was denied the right to refuse medical treatment. The Defendants contend that this claim should be dismissed because the Plaintiff consented to go to the hospital. (Defs. Memo. at 15.) They argue, in addition, that even if he did not go voluntarily, the claim should be dismissed because the EMS could have transported him to the hospital without his consent. (Id. at 15-16.) The Plaintiff responds that his injuries were not so severe as to justify taking him to the hospital without his consent, and that he did not submit voluntarily to hospitalization, but rather was coerced to do so. (Pl. Opp. at 19.) Because the court finds that the EMS could have transported the Plaintiff without his consent, the court need not decide whether the Plaintiff consented to this transportation.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has interpreted this Amendment to mean that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment...." Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990). The right to refuse medical treatment "does not rest upon 'a general and abstract right to hasten death, but on well-established, traditional rights to bodily integrity and freedom from unwanted touching.'" Blouin v. Spitzer, 356 F.3d 348, 360 (2d Cir. 2004) (citing Vacco v. Quill, 521 U.S. 793, 807 (1997)). This right is "squarely grounded in the act of consent: Everyone, regardless of physical condition, is entitled, *if competent*, to refuse unwanted lifesaving medical treatment." Blouin, 356 F.3d at 360 (citations and quotation marks omitted) (emphasis in original).

However, the state has an interest in protecting and preserving the lives of its citizens. Green, 2004 U.S. Dist. LEXIS 5, at *34. Therefore, when an officer reasonably concludes that an

individual cannot make a competent judgment, or that the official would very likely expose himself to potential liability if he does not transport the individual to a hospital, that officer may force the injured individual to receive medical treatment even against that individual's will.  See Green, 2004 U.S. Dist. LEXIS 5, at *36-37; see also Vazquez v. Marciano, 169 F. Supp. 2d 248, 253 (S.D.N.Y. 2001).

In Green v. City of New York, for example, a woman called for emergency medical assistance because she believed that her husband could not breathe.  Green, 2004 U.S. Dist. LEXIS 5, at *35.  At least one of the medical officers, after his arrival on the scene, believed that the husband was dying and that he would have to go to the hospital to survive.  Id.  The husband, who could communicate only through blinking and through a computer, expressed to his wife that he did not wish to go to the hospital, and she communicated this message to the medical officers; however, the technicians transferred him to the hospital in spite of his wishes.  Id. at *3, *15-*16. The court found that it was reasonable for the emergency medical officials to transport the plaintiff to the hospital against his will, and the court therefore refused to impose liability on the officials for their conduct.  Specifically, the court reasoned that "the crisis atmosphere would have caused the officers to conclude that this was not a setting in which [the plaintiff] could make an informed and competent decision regarding his treatment," and that the officers would have exposed themselves to potential liability had they not transported the plaintiff to the hospital given the "extreme danger" of his medical condition.  Id. at *36-*38.

The court in Vazquez v. Marciano came to a similar conclusion.  In that case, the plaintiff had been in a serious car accident.  Vazquez v. Marciano, 169 F. Supp. 2d 248, 250 (S.D.N.Y. 2001).  Plaintiff's car hit a tree, causing him to momentarily black out and rendering his

passenger unconscious and trapped inside the vehicle. Id. at 250, 253. When officers arrived, the plaintiff tried to evade them. Id. at 250. Once apprehended, the plaintiff was taken to the hospital against his express wishes. Id. at 250-51. When the plaintiff sued the officer for forcing him to undergo medical treatment, the court determined that the officers were entitled to qualified immunity because the officers had acted in an objectively reasonable manner. Id. at 253. Specifically, the court reasoned that the plaintiff could not have made a rational decision because he was inebriated and because of the crisis atmosphere. See id. Furthermore, it was reasonable for the officer to transport the plaintiff to the hospital because, given the plaintiff's injuries, the officer would have been exposed to liability had he not transported the plaintiff. Id.

In the present case, interpreted in the light most favorable to the Plaintiff, the facts suggest that a conclusion similar to that in Green and Vazquez is appropriate. A fire "was raging out of control" at the Plaintiff's residence. (Pl. Am. Comp. at 2.) In his escape from the fire, the Plaintiff burned the left side of his face, his left ear, his right hand, and four of his fingers. (Id. at 2.) Later, the Plaintiff was struck, allegedly so hard that his nose was broken and there was blood "all over" the Plaintiff's pants and shirt. (Petway Dep. at 83-85.) The Plaintiff then received medical attention from Lt. Miller, an EMS official, who testified that she believed that if the Plaintiff was not treated at a hospital, he could have lost a limb or even his life. (Miller Dep. at 25.) The Plaintiff repeatedly refused to go to the hospital and was repeatedly told that he could and would be taken against his will if it was determined that his life was at risk. (Id. at 86-88.) Eventually, he agreed to go to the hospital. (Id. at 5.) He ultimately was treated at the hospital's burn unit for over two weeks. (Pl. Dep. at 95.)

In this case, as in the Green and Vazquez cases, there was an emergency "crisis" situation.

24

Notably, while the plaintiff in <u>Green</u> was hospitalized for five days, the Plaintiff here was injured to the extent that he needed over two weeks hospitalization. Similarly, the officers in this case, like those in <u>Green</u> and <u>Vazquez</u>, could reasonably have believed that they would have exposed themselves to legal liability if they had permitted the Plaintiff to refuse medical treatment. A person's right to refuse medical treatment must be balanced with the state's interest in preserving the lives and safety of its citizens. Imposing liability in such a situation as this would impermissibly discourage medical professionals from performing their life-saving functions. <u>See</u> <u>Green</u>, 2004 U.S. Dist. LEXIS 5, at *36-37 ("The state also has an interest in protecting its employees from liability for decisions such as the one in this case; imposing liability in this circumstance could cause future decision makers to err on the side of leaving critically ill patients without professional medical assistance.")

It should further be noted that the Plaintiff has failed to provide the court with any case law in support of this Fourteenth Amendment claim. He has provided no case in which a seriously injured person, forced to accept medical treatment under crisis conditions, collected damages arising from the Fourteenth Amendment right to refuse medical treatment. Therefore, given the crisis situation, the Plaintiff's serious injuries, the lack of supporting relevant case law, and the underlying policy considerations, the court finds that the Defendants did not violate the Plaintiff's Fourteenth Amendment right to refuse medical treatment.

Notwithstanding that the Plaintiff's Fourteenth Amendment right was violated, the Defendants are nonetheless immune from liability here. As noted above, the court engages in a two-step analysis when it seeks to determine whether a municipal employee should be protected by qualified immunity against a § 1983 claim. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). In the

first step, the court determines whether a constitutional right was violated.  Id.  In the second step, the court determines whether that right was clearly established, considering the particular circumstances of the case.  Id.  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see also Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004).

Assuming, arguendo, that the Plaintiff's Fourteenth Amendment rights were violated, it cannot be said that the Defendants acted in an unreasonable manner when they forced him to accept medical treatment, especially considering the fact that the Plaintiff was so severely burned that he required over two weeks of hospitalization, that one EMS official believed that his life was at risk, and that the Plaintiff's decision-making process may have been impaired by the crisis atmosphere.  Given these circumstances, Lt. Miller and Sgt. Motolla acted in an objectively reasonable fashion.  See Luna, 356 F.3d at 490 ("[E]ven assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully.")  The Plaintiff's right to refuse medical treatment under these conditions was therefore not clearly established.  Even if the Defendants did violate his Fourteenth Amendment rights, they are nevertheless protected under the doctrine of qualified immunity.

**IV.    Conclusion**

For the foregoing reasons, the Defendants' motion for summary judgment is granted in part and denied in part.  Defendants' motion for summary judgment is GRANTED with respect to the following: claims against NYPD, FDNY, EMS; claims against Officer Grau; claims against Lt. Miller and the two unidentified firemen; § 1983 claims for verbal abuse; § 1983

claims against the City of New York; claims against Chief Hickey, Officer Barone, and Sgt. Motolla concerning the alleged striking of the Plaintiff by Lt. McDermott; and the Plaintiff's claim of a Fourteenth Amendment violation of the right to refuse medical treatment. The aforementioned claims are dismissed. Defendants' motion for summary judgment is DENIED with respect to the following: claims against Lt. McDermott for excessive use of force and Plaintiff's false arrest claims. In addition, Plaintiff's motion to compel discovery is denied.

The parties are instructed to contact Magistrate Judge Bloom to prepare a pre-trial order.

SO ORDERED.

Dated: September 2, 2005
   Brooklyn, N.Y.

          _/s/ Nicholas G. Garaufis_____
          Nicholas G. Garaufis
          United States District Judge